**Ronald W. McBETH, Richland County Assistant State's Attorney, Petitioner and Appellee,**

v.

**J.J.H., a child, and Simone Sandberg, Guardian ad Litem of said child, Respondents and Appellees,**

**J.H., parent of said child, Respondent,**

and

**L.H., parent of said child, Respondent and Appellant.**

**Civ. No. 10468.**

Supreme Court of North Dakota.

Jan. 13, 1984.

Earle R. Myers, Jr., State's Atty., Wahpeton, for petitioner and appellee.

Simone Sandberg, Wahpeton, guardian ad litem.

Don R. Krassin, Krassin Law Office, Wahpeton, for respondent and appellant.

VANDE WALLE, Justice.

L.H., the mother of J.J.H., appealed from the final order of the juvenile court of Richland County which terminated her and her husband's parental rights. We affirm.

On June 15, 1982, J.J.H. ("Jenny") was born. At the time of her birth her parents, L.H. ("Lisa") and J.H. ("James") were married. (The names are pseudonyms.) After living with her parents for three weeks, Jenny was placed in foster care on July 9, 1982.

On October 20, 1982, there was a hearing to determine if Jenny was a deprived child. The trial court found Jenny to be a deprived child and, after stipulation of the parties, the trial court ordered that custody of Jenny be placed with the Richland County Social Service Board, with the recom-mendation that the paternal grandparents provide foster care for Jenny. The court stated that within six months Lisa and James must present to the court a plan for the long-term care of Lisa. The grandparents agreed to be foster parents. While driving to their home, the grandparents changed their minds and within hours returned Jenny to the Richland County Social Service Board.

Richland County Social Service Board subsequently filed a petition seeking the termination of the parental rights of Lisa and James. At the time of the termination hearing, Lisa was 17 years of age and James, who attended the North Dakota State School of Science, was 20 years of age. After hearing testimony on April 11 and 12, 1983, the trial court granted the petition. Only Lisa appealed.

On appeal Lisa raises two issues. She contends that the determination of her parental rights should be based solely upon the evidence presented at the April 11 and 12 hearing. She also argues that there is insufficient evidence to support the termination of her parental rights.

I

Lisa maintains that the determination of her parental rights must be based upon only the record produced at the April termination hearing and not on the October deprivation hearing. At the April termination hearing the witnesses included those who testified at the October deprivation hearing. These witnesses testified to the same events they testified to at the October hearing. Lisa argues, however, that the determination of her parental rights must not be based upon admissions she made at the October deprivation hearing.

The issue of whether or not a court should consider testimony in proceedings prior to the hearing for termination merits only a brief comment because we believe that the record established at the termination hearing is itself sufficient to support the trial court's decision to terminate Lisa's parental rights. In *In Interest of R.H.,*

262 N.W.2d 719, 722 (N.D.1978), we stated that "[t]estimony admitted during a separate proceeding, where the termination of parental rights was not at issue, should not be judicially noticed, over objection, in a proceeding where a termination of parental rights is sought." In that case one of the parties requested that the trial court take judicial notice of proceedings conducted prior to the termination proceeding; on appeal there was no transcript of the testimony from which the trial court may have taken judicial notice.

■ Although we recognize that due process prohibits a court from taking judicial notice of testimony of proceedings prior to the termination of parental rights if the parents did not receive the notice required for termination, "we do not believe [that] the juvenile court need operate in a vacuum concerning the *results* of the previous proceedings ..." *In Interest of M.R.*, 334 N.W.2d 848, 853 (N.D.1983). [Emphasis supplied.] At a termination hearing a trial court necessarily considers prior proceedings and the events that followed when determining if the conditions and causes of the deprivation are likely to continue or will not be remedied, one of the elements to be established in terminating parental rights. See Sec. 27–20–44(1)(b), N.D.C.C. See, generally, *In Interest of J.A.*, 283 N.W.2d 83 (N.D.1979). And on appeal this court considers the evidence produced at the termination hearing, which naturally includes the history of the family. See *In Interest of L.N.*, 319 N.W.2d 801 (N.D.1982).

■ In the present case, the trial court at the termination hearing listened to the witnesses testify to the same events they testified to at the deprivation hearing, except that at the termination hearing Lisa did not make the admissions she made at the deprivation hearing. If we assume the trial court considered prior proceedings, it could properly do so under these circumstances with the exception of the admissions Lisa made at the deprivation hearing. As we discuss in the next portion of this opinion, there is ample evidence without

Lisa's admissions to support the findings of the trial court.

II

■ Lisa also contends that there was insufficient evidence to support the termination of her parental rights. In reviewing the evidence presented to the trial court we are not restricted by the standards of Rule 52(a), N.D.R.Civ.P. The Uniform Juvenile Court Act provides that our review of the files, records, and minutes or transcript of the evidence of the juvenile court is similar to the former procedure of a trial de novo. Sec. 27–20–56(1), N.D.C.C. We give the juvenile court's findings appreciable weight, but we are not bound by them. *Asendorf v. M.S.S.*, 342 N.W.2d 203 (N.D. 1983); *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981). We nevertheless recognize that the trial court had the opportunity to observe the demeanor of the witnesses. *In Interest of D.S.*, 325 N.W.2d 654 (N.D.1982).

■ Before a court may terminate parental rights, it must find that the State has established by clear and convincing evidence three factors: that the child is a "deprived child"; that the conditions and causes of the deprivation are likely to continue and will not be remedied; and that by reason of the continuous or irremedial conditions and causes, the child is suffering or probably will suffer serious physical mental, moral, or emotional harm. See *Asendorf v. M.S.S., supra;* Sec. 27–20–44(1)(b), N.D.C.C. Although parents have a fundamental right to their child which is of constitutional dimension [*Kleingartner v. D.P. A.B., supra*], parental rights will "not be enforced to the detriment or destruction of the happiness and well-being of the child." *In Interest of F.H.*, 283 N.W.2d 202 (N.D. 1979).

■ Section 27–20–02(5), N.D.C.C., provides, in part, that a child is deprived if he

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical,

mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian; . . ."

Although the trial court stated at the October hearing that Jenny was a deprived child, the determination is not res judicata for the purpose of establishing deprivation at the termination hearing. *In Interest of R.H., supra.* The testimony of various witnesses who testified at the termination hearing, however, reveals that Jenny is a deprived child.

At the trial social workers and the foster mother testified that Lisa did not properly care for Jenny. Lisa told a social worker that she wanted to place Jenny in foster care while she went camping for the weekend because she was afraid that she might hurt her and because she did not want to be left alone at home. During the camping trip Lisa and James did not discuss if they would try to care for Jenny.

Lisa's lack of proper care for Jenny was also manifested by the problems related to visitations, which were well documented at trial. Lisa first visited Jenny at the foster mother's house. The foster mother testified that she believed that Lisa stopped by to visit her rather than Jenny. When Lisa visited, she did not want to hold or feed Jenny. The social workers then changed the plan for visitation by arranging that Lisa could care for Jenny in her own home.

Lisa infrequently exercised her right to care for Jenny during the day. When she did decide to care for Jenny in her home, Lisa sometimes would admit to social workers that she did not have bottles, diapers, or formula for Jenny. The social workers then would not let Lisa take her home. Lisa's lack of interest in obtaining a crib for Jenny also reduced the opportunities for Jenny to stay overnight. Jenny spent only two weekends with Lisa and James. On both occasions James refused to sleep at home the first night that Jenny was there. The foster mother testified that Lisa had difficulty in remembering what food she should give Jenny and Jenny's sleeping schedule. The foster mother also testified that occasionally Jenny would return hungry and wearing the same diaper she had on before going to Lisa's home.

Social workers testified that Lisa stated that she wanted to care for Jenny because James's parents would then continue to pay for his schooling and because she was concerned about the stigma of having her parental rights terminated. Lisa admitted at trial that she would be solely responsible for caring for Jenny while she is an infant because James would not want to be involved until Jenny is able to enjoy the activities in which he is interested, such as camping and going to fairs. At trial James stated that he had never fed Jenny nor changed her diapers and that during the last 10 months he had held Jenny for not much more than an hour. After considering the nurturing that James and Lisa provided Jenny, we believe that Jenny was a deprived child, that is, Lisa as well as James failed to provide proper care. Their efforts failed to meet the minimum standards of care which the community will tolerate. *In Interest of L.N., supra; In Interest of R.H., supra.*

This court recognizes, however, that immaturity alone cannot support a finding that the conditions and causes of the deprivation are likely to continue or will not be remedied, the second element to be established in terminating parental rights. *In Interest of B.M.,* 335 N.W.2d 321 (N.D. 1983); *In Interest of J.K.S.,* 274 N.W.2d 244 (N.D.1979). In determining the likelihood of continued deprivation, a court may consider past deprivation, but the evidence of prior deprivation must be prognostic. *In Interest of D.S., supra; In Interest of J.N.R.,* 322 N.W.2d 465 (N.D.1982). Evidence of marital difficulties is relevant in determining if the deprivation is likely to continue. See *In Interest of M.R., supra.* Lisa argues that the deprivation will not continue, citing for support *In re J.V.,* 185 N.W.2d 487 (N.D.1971).

In *In re J.V.,* the natural mother did not visit her child for about three years because she protested the visitation schedule

and because she was under emotional pressure due to her alcoholic husband. She later remarried. In holding that her parental rights should not be terminated, we stated:

"Since the remarriage of the mother conditions have materially improved. She now has a home which is suitable, and the conditions and causes of her emotional stress have been eliminated.... The separation of the mother and her children was brought about by circumstances beyond her control ..." 185 N.W.2d at 492.

That case is clearly distinguishable from the present case because conditions have not materially improved. Two social workers, the juvenile supervisor for Richland County, and the foster mother testified that in their opinions the circumstances would not improve in the future. The record is replete with testimony concerning the tension created in the marriage of Lisa and James because of Jenny's presence.

There was testimony that James refused to let Lisa buy food and diapers for Jenny, even though he stated that money was not a problem. When Jenny stayed with them one weekend several violent altercations occurred which prompted intervention by the police and campus security. There also was evidence that Lisa has physically abused James. James admitted at trial that when he and Lisa tried to discuss taking care of Jenny, they almost always ended up quarreling. They both failed to agree to a plan for taking care of Jenny even though the trial court, at the October deprivation hearing, gave them six months to do so.

■■■■ We have recognized that it is dangerous to allow the judgment of social workers to determine how a family is to be run. See, e.g., *Bjerke v. D.T.*, 248 N.W.2d 808 (N.D.1976). But, in determining the likelihood of continuing deprivation, a trial court may nevertheless consider parental cooperation with social-service agencies. *In Interest of D.S., supra; In Interest of J.A., supra.* The social workers recommended that Lisa and James take classes in

parenting and receive counseling. Although they once did visit a pastor for counseling, neither took any classes to improve their nurturing skills. James also testified that he would not seek counseling because he was capable of solving his own problems. Although marital difficulties may explain their lack of cooperation with the social services and Lisa's infrequent visits with Jenny, there is sufficient prognostic evidence to support the determination that the conditions and cause of the deprivation are likely to continue or will not be remedied.

■■■■ A showing of parental misconduct is not sufficient in termination cases, however, without a showing that there is resultant harm to the child. *In Interest of D.S., supra.* The numerous violent quarrels engendered by Jenny's presence when combined with evidence of Lisa's temper indicate that Jenny was in danger when visiting her parents. To terminate parental rights, a court need not await the happening of a tragic event. *McGurren v. S.T.*, 241 N.W.2d 690 (N.D.1976). A court avoids serious risk to a child by requiring that there be clear and convincing evidence that termination is necessary. *Waagen v. R.J.B.*, 248 N.W.2d 815 (N.D.1976). In the present case the circumstances indicate that Lisa is incapable of providing a stable environment for Jenny. Even though the social workers attempted to aid Lisa in caring for Jenny in her home, the result was that Jenny has been in foster care basically since she was three weeks old. Lisa's care of Jenny suggests that she did not comprehend the importance of stability. At her own convenience and in disregard of the schedule for visitation, Lisa would pick up Jenny or return her. This court, however, has recognized the importance of a stable environment for the health and happiness of a child. See, e.g., *In Interest of D.S., supra; Kleingartner v. D.P.A.B., supra.* We therefore believe that if Jenny were to be with Lisa, Jenny probably would suffer serious physical, mental, moral, or emotional harm.

The final order of the juvenile court terminating Lisa's parental rights is affirmed.

ERICKSTAD, C.J., and SAND, GIERKE and PEDERSON, JJ., concur.